IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2020

**STATE OF TENNESSEE v. KELVIN DEWAYNE GOLDEN**

**Appeal from the Circuit Court for Madison County**
**No. 19-180      Roy B. Morgan, Jr., Judge**

_____

**No. W2019-01418-CCA-R3-CD**

_____

The Defendant, Kelvin Dewayne Golden, was convicted after a jury trial of rape of a child, and he received a sentence of thirty years. In this appeal as of right, the Defendant contends (1) that the juvenile court erred in transferring him to criminal court, (2) that the trial court erred in denying his motion to dismiss due to a delay in prosecuting the case, and (3) that the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant Public Defender, for the appellant, Kelvin Dewayne Golden.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Lee R. Sparks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the Defendant's allegedly sexually abusing the victim, T.B.,[1] when they were out of school on spring break in 2013; T.B. was eight years of age and the Defendant was sixteen years of age at that time. Though the victim did not initially report the abuse, when the victim's mother found out about the abuse later that year, she informed

_____
[1] It is the policy of this court to refer to minor victims of sexual abuse by their initials.

the authorities. Subsequently, on October 28, 2016, a delinquency petition was issued against the Defendant alleging rape of a child, T.B. See Tenn. Code Ann. § 39-13-522. For the "date and time of arrest," the petition indicated that the Defendant was already in the custody of the Madison County Jail.

In the petition, Jackson Police Department Investigator Jay Stanfill averred that the eight-year-old victim "disclosed in July of 2013 to Monica Goodman, a forensic Interviewer with the Child Advocacy Center in Jackson, T[ennessee] and officers of the Jackson Police that he had been sexually assaulted multiple times by" the sixteen-year-old Defendant, "beginning months earlier in the year."

According to Investigator Stanfill, the victim was interviewed again on October 24, 2016, and during this interview, the victim indicated "that he was not certain of the exact day of the last time he was sexually assaulted by [the Defendant], but he believe[d] it was sometime in June 2013"; that "every incident" of abuse occurred at the victim's grandmother's house, which was located in Jackson; and that "the last incident happened in the living room of this location on a fold[-]out sofa bed."

The victim described "the last incident," stating that the Defendant "picked him up and placed him on the sofa bed, rolled him over on his stomach, pulled his shorts off against his will . . . , then placed himself on top of [the victim's] buttocks and anally penetrated him repeatedly with his penis for several minutes." The victim indicated that after this incident, he "had rectal bleeding for several days." According to Investigator Stanfill, the victim "discussed this injury [with] other family members and this led to [the victim's] mother discovering the abuse and notifying police on July 19, 2013." This concluded the information provided by Investigator Stanfill in the delinquency petition.

A. Transfer Hearing. On November 8, 2016, the State filed a motion pursuant to Tennessee Code Annotated section 37-1-134 to have the Defendant transferred from juvenile court to criminal court. The State indicated therein that the Defendant was charged with rape of a child, that he was sixteen years of age or more at the time of the alleged conduct, that the court would schedule a forensic examination, and that the statutory criteria for transfer would be met at the hearing. A hearing was held on February 1, 2017.

From the hearing, only the testimony of the victim, who was twelve years old at that time, was transcribed. The victim first identified the Defendant in the courtroom, and then the victim discussed "the allegations that happened between" him and the Defendant at the victim's grandmother's house in Jackson in 2013, when the victim was eight years old. Specifically, the victim believed that the relevant events took place during the summer of 2013 because it was "hot" and he "was out of school." The victim recalled that he stayed

with his grandmother while his mother worked and that the Defendant came over sometimes.

The victim described that the "first time" something inappropriate happened between him and the Defendant, the victim had gone into his grandmother's living room, and the Defendant had tried to jump on top of him; however, nothing else happened on that occasion. The victim recalled that on "[a]nother day," when he was playing a game with his brother, the Defendant called the victim into the bathroom. The Defendant told the victim to "[s]uck on his balls," but the victim refused and left. The victim recalled that on more than one occasion, the Defendant tried to pull down the victim's pants; on one of these occasions, the victim was in the living room when the Defendant was able to successfully pull down the victim's pants, and the Defendant inserted his finger into the victim's anus. Afterward, the victim experienced rectal bleeding when he used the bathroom.

The victim stated that shortly after this last event, his family moved, and he did not visit his grandmother as frequently. Following the move, the victim told his brother and his cousins about the abuse. The victim confirmed that he also later spoke with the police.

On cross-examination, the victim indicated that he was between the fourth and fifth grades "when all this came up" and that he was out of school at the time. The victim recalled that he got out of school in May 2013; however, the victim did not think these events took place in May, but instead occurred sometime thereafter. When the victim was asked if he was "really sure . . . that it happened after [he] got out of school for the summer and it happened before school started back" in August, he answered affirmatively.

According to the victim, he had not met the Defendant prior to this summer. The victim agreed that during this time, his brother accompanied him to his grandmother's house "most days." The victim also confirmed that "these three incidents happened pretty close together," though not on the same day. Relative to when he reported, the victim explained that his family had moved before school started back and that he had reported the abuse prior to starting school.

Although not referenced in the transcript, we note that there is a document titled "Integrated Assessment, Psychosocial Assessment, Part 1" in the technical record, which is marked "Exhibit 1" with the date February 1, 2017, written next to it. The document reflects that on September 3, 2013, the Defendant was assessed at his home, and the assessment worker entered findings regarding the Defendant's educational background, his behavioral and social history, and his treatment history. In addition, the assessment worker evaluated the Defendant's mental health and included her tentative diagnoses in the

document.  Those diagnoses included a mood disorder, not otherwise specified; Attention Deficit, Hyperactivity disorder; a conduct disorder; and cannabis abuse.

Following this document, there is a discharge summary from Dr. David L. Struble in the technical record, though it is not marked separately as an exhibit to the hearing.  Dr. Struble indicates therein that he dictated the contents of the document on August 8, 2013.  In the discharge summary, Dr. Struble notes that the Defendant entered into the Adolescent Program at Compass Residential Treatment Center on May 2, 2013, where he received treatment for his behavioral issues, but that the Defendant was discharged on July 25, 2013, following sexually inappropriate comments and allegations of sexual assault.  Dr. Struble also included his findings regarding the Defendant's mental health and provided his diagnostic impression, which was the same as the assessment worker's.

The case was transferred from juvenile court to criminal court by written order dated February 7, 2017.  In the order, the juvenile court determined as follows:

> (1) There were reasonable grounds to believe that the [Defendant committed the] offense of [r]ape of a [c]hild;
> (2) Said juvenile is not committable to an institution for the mentally retarded or mentally ill; and
> (3) Said juvenile should be placed under legal restraint or discipline in the interests of the community.

B. <u>Motion to Dismiss</u>.  Once transferred to criminal court,[2] the Defendant filed a notice of alibi on March 27, 2018, in Case Number 18-86.  In the notice, the Defendant stated that the indictment alleged that the offense(s) occurred during the month of June 2013 and that he "was in the exclusive control and custody of Compass Intervention Center in its facility in Memphis, Tennessee during the entire month of June 2013."  On August 14, 2018, this time in Case Number 18-557, the Defendant filed another notice of alibi.  In the notice, the Defendant stated that the indictment alleged that the offense(s) occurred "on or about May of 2013" and that he was likewise in the exclusive custody and control of Compass Intervention Center during the period alleged.  On February 25, 2019, the

---

[2] At the motion to dismiss hearing, the trial court indicated that the original indictment was returned on January 29, 2018, followed by a second indictment on May 30, 2018.  Neither of those indictments are included with the record on appeal.

Madison County Grand Jury indicted the Defendant in Case Number 19-180, the present case, for rape of a child, T.B., occurring "on or about March 25 through April 1, 2013."[3]

Thereafter, on March 25, 2019, the Defendant filed a motion to dismiss due to violations of his constitutional "rights of due process, his right to a speedy trial, and right to a fair trial." The Defendant first recounted the procedural history of the State's issuing three indictments to change the dates of the alleged offenses following the Defendant's notices of alibi. The Defendant then noted that "neither the Madison County Juvenile Court nor the Madison County Grand Jury were apprised or made aware of the various change of 'dates' or 'time periods' when a determination of probable cause was made" and that "the 'dates' or 'time periods' did not begin to shift until well after his giving [n]otice[s] of [a]libi."

The Defendant then examined the balancing test outlined in Barker v. Wingo, 407 U.S. 514, 530-32 (1972), for courts to use in determining whether a defendant's right to a speedy trial has been violated. The Defendant stated that "six years ha[d] passed since the indictment was returned," which demonstrated "at the very least bureaucratic indifference and negligence on the part of the State." The Defendant also claimed that he had "asserted his right to a speedy trial with this request for a jury trial since the indictment was returned in Madison County Circuit Court Docket No. 18-86." Finally, relative to prejudice, the Defendant alleged that due to the passage of time, (1) "his and other witness' memories ha[d] faded . . . , and witnesses [might have] no longer be[en] available"; (2) "a matter in which he was unaware ha[d] now intensified anxiety and concern for himself"; and (3) "this matter could have been resolved when the Defendant was a juvenile rather than as an adult, and the consequences of that ha[d] increased dramatically."

The State filed a response and contended that application of the Barker factors did not support dismissal. The State noted that this case was initially indicted on January 29, 2018, along with another case, Case Number 18-87; Case Number 18-87 was tried on May 30, 2018, resulting in a guilty verdict for aggravated sexual assault; that the Defendant was sentenced for that conviction on June 25, 2018; and that it was only after Case Number 18-87 was completed that the parties focused on the instant case. The State also asserted that the Defendant's speedy trial right did not begin until he was indicted in criminal court on January 29, 2018, and that only sixteen months had passed. According to the State, the Defendant also had not timely asserted his right to a speedy trial. Relative to prejudice, the State indicated that it was their case that suffered with the passage of time and faded

---

[3] The Defendant was also charged with another count of child rape on or about April 2013 and solicitation to commit rape of a child on or about April 2013. However, those counts were severed from Count One, the subject of this appeal, and were later dismissed by motion to nolle prosequi.

memories, not the Defendant's, especially when a child victim was involved, and that the Defendant had not shown that any witnesses were no longer available.

A hearing on the motion to dismiss was held on April 15, 2019, and a written order was entered thereafter. The trial court assessed the speedy trial factors and denied the Defendant's motion to dismiss. In so concluding, the trial court noted that the original indictment was January 29, 2018; that the length of the delay was "not great"; that "[a]ny delay in this matter was that necessary to conduct a fair and effective prosecution" in Case Number 18-87; that the Defendant was incarcerated as a result of his conviction in that case; that this was the Defendant's first assertion of his right to a speedy trial; and that the Defendant had not suffered any prejudicial impact from the delay, agreeing with the State that any faded memories due to the passage of time hindered the prosecution of the State's case, who had the burden of proof, rather than the Defendant's.

C. Trial. The Defendant proceeded to a jury trial held on May 14, 2019. At the trial, the victim, who was then fourteen years old, again testified about the allegations regarding the Defendant that occurred in 2013. The victim stated that he was staying at his grandmother's house while his mother worked and that he "was out of school." Asked to describe what happened, the victim said that "[he] was lying in his bed one night," when the Defendant came into the victim's room and placed his hands on the victim's shoulders and held the victim down so the victim could not move. The victim described that though they struggled, the victim was unable to free himself, and the Defendant pulled down the victim's pants and put his "private part" in the victim's anus. The victim said that the Defendant did not ejaculate and that he did not suffer injury from the Defendant's behavior.

The victim testified that he was living in Chapel Ridge when this incident occurred and that he believed it took place "[m]aybe around April." He described the weather as both hot and warm outside.

According to the victim, the Defendant threatened him if he told anyone about the abuse. The victim indicated that he and his mother moved from the Chapel Ridge location a couple of months later, but still prior to the new school year's starting. After the move, the victim's aunt overheard the victim telling his cousins about the abuse, and she told the victim's mother. The victim recalled that he was later interviewed, though he could not remember who conducted the initial interview. The victim did remember later speaking with Investigator Stanfill and relaying to Investigator Stanfill what had happened.

On cross-examination, the victim indicated that this incident took place when he was out of school for "spring break." However, the victim acknowledged that he had previously testified about these allegations and that at that hearing, he said it was summertime, that he "wasn't going to school," that this happened sometime after May, and

-6-

that he did not know the Defendant prior to the summer of 2013. The victim agreed that his prior testimony was inconsistent with his trial testimony.

In addition, the victim did not remember ever informing anyone that his rectum bled following the Defendant's actions. The victim asserted that such did not happen, despite any recorded statement to the contrary.

On redirect, the victim affirmed that he stayed at his grandmother's house over spring break of that year and that the Defendant was present.

The victim's grandmother indicated that in 2013, the victim stayed with her during the summer and on the weekends while the victim's mother worked, that the victim's brother came to stay with her frequently as well, and that sometimes the victim's sister also came to visit. The victim's grandmother explained that she became acquainted with the Defendant's mother through bible study and that the Defendant began staying at her house from time to time. The victim's grandmother confirmed that both the victim and the Defendant spent the night at her house at the same time; however, she never witnessed any sexual abuse.

The victim's mother stated that she was familiar with the Defendant's family, and she had known the Defendant "since he was little." The victim's mother indicated that in the spring of 2013, she lived in Chapel Ridge, but she had moved from that area by August or September of that year. The victim's mother testified that she worked full-time in 2013 as a "shift leader" at a Subway restaurant; because she sometimes worked late, the victim spent the night with his grandmother. According to the victim's mother, the Defendant also occasionally spent the night at the victim's grandmother's house; she took the victim over to his grandmother's house during spring break of that year because the victim was out of school; and the Defendant was present during that time.

The victim's mother testified that after they moved from Chapel Ridge, she was informed about the sexual abuse allegations by her sister. When the victim's mother asked the victim about what had happened, the victim disclosed the details of the sexual abuse. The victim's mother stated that she then called the Defendant's mother to "inform[]her that [she] was calling the police to press charges against [the Defendant]." Thereafter, the victim's mother called the police and reported the incident.

On cross-examination, the victim's mother confirmed that during the investigation into this matter, she had spoken with Investigator Stanfill. She did not recall telling Investigator Stanfill that this incident took place "during the summertime, June, July of 2013," or that the victim suffered any injury, such as rectal bleeding; the victim's mother asserted that any police report to that effect was incorrect.

That concluded the State's proof. The Defendant called Investigator Stanfill to testify. Investigator Stanfill testified that he was "[t]he second investigator" to be assigned this case and that after he "took over the case" three years later, he met with the victim and the victim's mother on October 24, 2016. According to Investigator Stanfill, when he spoke with the victim, the victim was unsure of an exact date when the incident occurred, and the victim's mother told Investigator Stanfill that she thought it happened in June 2013 because that was "when they had moved and changed residence." According to Investigator Stanfill, the victim told him that the Defendant's actions had caused his "booty" to bleed "for several days and he never told his mother about it."

Based on the initial information, Investigator Stanfill prepared a petition in juvenile court alleging the offense to have occurred in June 2013. Investigator Stanfill confirmed that the matter was transferred from juvenile court to criminal court and that an indictment was returned on January 29, 2018, using the same date—Case Number 18-86. Investigator Stanfill further agreed that the Defendant filed a notice of an alibi defense, although Investigator Stanfill was unaware of any specifics of that notice; that the January 29, 2018 indictment was dismissed; and that the Defendant was re-indicted on July 30, 2018,[4] in Case Number 18-57, alleging that the offense had occurred in May 2013 because "certain evidence had come to light since that time." Investigator Stanfill acknowledged that the second indictment was also dismissed and that the Defendant was subsequently re-indicted to again change the date of the offense, which was the indictment being tried.

When asked if the victim had visited a doctor, Investigator Stanfill responded that he had no knowledge of such because the incident had occurred three years before he began working on the case. Based upon Investigator Stanfill's recollection, the victim had told him "in more than one interview that his booty bled"; the victim's mother was present; and they had "talked about that." Investigator Stanfill opined that the victim's mother would "have been aware that he was talking about [being injured] three years later."

On cross-examination, based on his experience in investigating crimes involving children, Investigator Stanfill explained that "it [was] common for children not to be able to recall specifically, dates, times, events." Investigator Stanfill confirmed that during the investigation, he was contacted by the prosecutor to re-examine the initial date alleged for the incident. Investigator Stanfill indicated that he broadened the investigation and "began looking outside of the case and . . . the people [they] had initially talked to"; based upon this follow-up investigation, "different dates" were determined, which led to new indictments. Investigator Stanfill stated that he tried "to be as accurate as possible" and that "things started to make more sense as a bigger picture evolved."

---

[4] The correct date appears to be May 30, 2018.

On redirect, Investigator Stanfill explained that the investigator who was initially assigned the case no longer worked for the Jackson Police Department. According to Investigator Stanfill, that investigator had failed to complete the investigation.

Following the conclusion of proof, the jury found the Defendant guilty as charged of one count of rape of a child. The trial court ultimately sentenced the Defendant to thirty years at one-hundred percent service. He timely appealed.

ANALYSIS

On appeal, the Defendant argues that the juvenile court erred in transferring him to criminal court, that the trial court erred in denying his motion to dismiss due to a delay in prosecuting the case, and that the evidence was insufficient to support his conviction. We will address each issue in turn.

I. <em>Juvenile Transfer</em>

The Defendant argues that the juvenile court erred in transferring this matter to criminal court for the Defendant to be tried as an adult. According to the Defendant, "there were not reasonable grounds to believe the offense took place at the alleged time of June 2013" despite the victim's testimony at the transfer hearing that the offense took place in the summer of 2013 because the record establishes that the Defendant had been admitted to a residential treatment center during that time period. The Defendant further contends that "the record is devoid of any proof establishing that [the Defendant] is not committable to an institution for the developmentally disabled or mentally ill or if the interests of the community require that [the Defendant] be put under legal restraint or discipline" and that the juvenile court "failed to address any of the factors listed" in Tennessee Code Annotated section 37-1-134(b). The State responds that the juvenile court properly transferred the prosecution to criminal court.

The statute governing juvenile transfers provides that after a delinquency petition has been filed, the juvenile court "may transfer the child to the sheriff of the county to be held according to law and to be dealt with as an adult in the criminal court of competent jurisdiction." Tenn. Code Ann. § 37-1-134(a) (2016). The statute further requires that "[t]he disposition of the child shall be as if the child were an adult" if: (1) as applied to this case, the child was at least sixteen at the time of the offense; (2) a hearing was held in conformity with statute; (3) the notice requirements were met; and (4) the court finds "probable cause" grounds to believe that: "(A) The child committed the delinquent act as alleged; (B) The child is not committable to an institution for the developmentally disabled or mentally ill; and (C) The interests of the community require that the child be put under legal restraint or discipline." Tenn. Code Ann. § 37-1-134(a) (2016). A transfer from

-9-

juvenile court to criminal court is discretionary unless the grounds in subsection (a) are established. Howell v. State, 185 S.W.3d 319, 329 (Tenn. 2006). Additionally,

> [i]n making the determination required by subsection (a), the court shall consider, among other matters:
>
> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner;
> (5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
> (6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Tenn. Code Ann. § 37-1-134(b) (2016).

This court has previously stated that in reviewing a transfer decision, we do not evaluate the preponderance of the evidence but review to determine whether there are reasonable grounds or probable cause to support the decision that the three criteria of section 37-1-134(a)(4)(A)-(C) mentioned above were present. See State v. Strickland, 532 S.W.2d 912, 920 (Tenn. 1975); State v. Jacob Andrew Brown, No. W2012-01297-CCA-R3-CD, 2013 WL 4029216, at *6 (Tenn. Crim. App. Aug. 7, 2013). See also State v. Mario A. Reed, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6, *10 (Tenn. Crim. App. Aug. 31, 2010) (noting that the terms "probable cause" and "reasonable grounds" are used "interchangeably" in juvenile transfer analysis). This review is one for abuse of discretion. State v. Kayln Marie Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *38 (Tenn. Crim. App. Jan. 16, 2015); Howard Jefferson Atkins v. State, No. W2006-02221-CCA-R3-PC, 2008 WL 4071833, at *7 (Tenn. Crim. App. Aug. 29, 2008). See Howell, 185 S.W.3d at 329 (noting that if trial counsel's failure to evaluate the defendant's competency were deficient, the court would review "whether the juvenile court's decision to transfer [the defendant] regardless of whether she was committable to an institution would constitute an abuse of discretion").

Here, the State sought, and obtained, permission to supplement the record with the juvenile court's transfer order. The order indicates that in transferring the Defendant, the juvenile court found that all three prongs of Tennessee Code Annotated section 37-1-

134(a)(4) were present: that there were "reasonable grounds"[5] to believe that the Defendant committed the offense of rape of a child; that the Defendant was not committable to a mental health facility; and the interests of the community required that the Defendant be put under legal restraint or discipline.

The Defendant's argument initially focuses on the fact that the juvenile court transferred the case based upon a mistaken belief that the incident took place in June 2013 or the summer of 2013. Seemingly, the Defendant surmises that because this alleged timing of the events was later shown to be inaccurate, that no basis for the transfer existed in the first place. The Defendant cites to no law, and we know of none, that requires the same exact date for the allegations provided in juvenile court to be proven once the case is transferred to criminal court; some fluidity in the investigation and indictment process must be allowed. As discussed in the sufficiency section below, the specific date was not an element of the offense, and the State is allowed some leeway in proving the date when dealing with minor victims of sexual abuse. The Defendant's alibi evidence was not presented until March 27, 2018, over a year after the transfer hearing had taken place. Moreover, the offense for which the Defendant was ultimately convicted was not separate or independent of the conduct covered by the initial transfer proceeding. Accordingly, we conclude that at the time of the transfer hearing in this case, the juvenile court was presented with probable cause in the form of the victim's own testimony that the Defendant committed the act of rape of a child by anally penetrating the victim during the summer of 2013. Though the time period for the offense later changed by several months, this did not render the juvenile court's decision to transfer the case to criminal court a nullity or an abuse of its discretion.

The Defendant also alleges that (1) the record is devoid of proof that he is not committable to a mental health facility or that the interests of the community require that he be legally restrained or disciplined and (2) the juvenile court failed to address any of the considerations listed by section 37-1-134(b). First, we note that only the testimony of the victim from the transfer hearing was transcribed; there were no arguments of counsel, any findings of the juvenile court, or an exhibit list included. The transcript is incomplete, and we are, therefore, left without an adequate record to review. It is an appellant's responsibility to prepare an adequate record for this court to address the issues. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Failure to do so precludes our consideration of this matter. See, e.g., State v. Simmons, 108 S.W.3d 881, 887 (Tenn. Crim. App. 2002) (citing Tenn. R. App. P. 24(b)). Our review is, therefore, limited to plain error. See Tenn.

---

[5] At the time the delinquency petition was filed and the transfer hearing was held, the statute used the phrase "probable cause" rather than "reasonable grounds." However, as noted, these terms have been used interchangeably in juvenile transfer analysis. Reed, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *6.

R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

There are five factors that must be established before an error may be recognized as plain:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 70 (Tenn. 2018) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016); State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). Furthermore, the error must be "clear" or "obvious," State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial," Smith, 24 S.W.3d at 283.

Relative to the Defendant's first allegation that the record is devoid of proof that he is not committable to a mental health facility or that the interests of the community require that he be legally restrained or discipline, the Defendant acknowledges that this court has held that "[a]lthough the trial court did not discuss which facts [it] was specifically relying on to conclude that the three criteria [of section 37-1-134(a)(4)(A)-(C)] were met, the record present[ed] a reasonable basis for determining that the necessary factors existed." State v. Brandon Ray Roland, No. E2002-00927-CCA-R3-CD, 2003 WL 21983024, at *18-19 (Tenn. Crim. App. Aug. 21, 2003). The documents in the technical record indicate that the juvenile court was presented with information regarding the Defendant's home life, his educational background, his behavioral and social history, and his treatment history. Both the assessment worker and Dr. Struble evaluated the Defendant and included their findings regarding the Defendant's mental health and provided a diagnostic impression. Those diagnoses included a mood disorder, not otherwise specified; Attention Deficit, Hyperactivity disorder; a conduct disorder; and cannabis abuse. Moreover, Dr. Struble stated in the discharge summary that while the Defendant was receiving residential treatment for his behavioral issues, he made sexually inappropriate comments, and following allegations of sexual assault, the Defendant was released from the facility. From the record before us, it appears that the juvenile court was presented with probable cause to conclude that the Defendant was not committable to an institution for either the mentally

-12-

disabled or the mentally ill and that the interests of the community would be best served by some type of legal restraint.

Moreover, relative to the Defendant's contention that the juvenile court failed to address any of the considerations listed by section 37-1-134(b), we note that this court has stated that there is no requirement that all the considerations listed by Tennessee Code Annotated section 37-1-134(b) be present. State v. Isiah Wilson, No. W2003-02394-CCA-R3-CD, 2004 WL 2533834, at *2 (Tenn. Crim. App. Nov. 8, 2004). This court has also held that although the juvenile court "did not specifically go through each of the factors [listed in Tennessee Code Annotated section 37-1-134(b)] line-by-line, it referenced the statute in making its findings and was clearly cognizant of the standards for transfer" to criminal court. State v. Justin Gray, No. W2011-01059-CCA-R3-CD, 2013 WL 475015, at *7 (Tenn. Crim. App. Feb. 6, 2013).

Nonetheless, "[t]hese factors relate to the interests of the community and whether the juvenile is amenable to treatment or rehabilitation through juvenile court rather than restraint or punishment meted out through the adult court[.]" State v. Cecil L. Groomes, No. M1998-00122-CCA-R3-CD, 2000 WL 1133542, at *7 (Tenn. Crim. App. Aug. 10, 2000). This crime was committed against an eight-year-old child and done so in an aggressive and premeditated fashion. The technical record indicates that there was evidence submitted at the hearing that included information concerning the nature of past treatment efforts and the Defendant's response thereto. The juvenile court's transfer order includes a citation to the pertinent statute and a discussion of the three criteria of subsection (a), indicating that it was cognizant of the relevant law. Based upon the record before us, there was sufficient evidence presented to support the juvenile court's decision to transfer the case to criminal court; we cannot say it was an abuse of its discretion. See, e.g., State v. Timothy Ken Sexton, No. E2000-01779-CCA-R3-CD, 2002 WL 1787946, at *8 (Tenn. Crim. App. Aug. 2, 2002) ("Although all six factors [of section 37-1-134(b)] were not explicitly listed in the juvenile court's findings, we conclude that there was sufficient evidence in the record to support the court's ruling.").

Accordingly, it does not appear that a clear and unequivocal rule of law was breached, that a substantial right of the accused was adversely affected, or that consideration of the error is necessary to do substantial justice. Thus, the Defendant is not entitled to plain error relief regarding these issues.

## II. *Delay in Prosecution*

Next, the Defendant contends that the trial court erred in denying his motion to dismiss due to a delay in prosecuting the case, citing to both his constitutional rights to a fair trial and a speedy trial. In support of his right to a fair trial claim, the Defendant

indicates that a three-year delay took place before the Jackson Police Department pursued this matter and that "the State waited until [the Defendant] was an adult before attempting to prosecute this matter"; the Defendant then notes the alibi, dismissal, and re-indictment process that occurred once the case was transferred to criminal court and submits that he was denied his right to fair trial. As for his right to a speedy trial claim, the Defendant again notes the three-year delay that took place before a delinquency petition was ever filed, and he alleges that there was no excusable reason provided for the delay. According to the Defendant, his filing of a notice of alibi was his assertion of his right to speedy trial. The Defendant also submits that he suffered prejudice "because he possibly could have been adjudicated as a juvenile rather than as an adult since he was a juvenile when the allegations first arose in 2013" and that the memories of the witnesses were affected by the passage of time given that neither the victim nor the victim's mother "could recall specific time periods or a possible traumatic injury involving rectal bleeding."

The State responds that the trial court properly denied the motion to dismiss. Preliminarily, the State contends that juvenile court proceedings are not criminal prosecutions and the right to a speedy trial does not apply and that because copies of the first two indictments and dismissals are not included in the record, the record is insufficient to determine if the delay approached one year, given that periods following a dismissal do not count toward the delay which may trigger a speedy trial claim. Finally, the State argues that the trial court properly found the minimal delay was necessary due to the other prosecution in Case Number 18-87 that took place in the interim and that the State did not act in bad faith.

We review issues of constitutional law de novo with no presumption of correctness attaching to the legal conclusions reached by the courts below. State v. Davis, 266 S.W.3d 896, 901 (Tenn. 2008); State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006). "Neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." In re Gault, 387 U.S. 1, 14 (1967) (applying various due process rights to juvenile proceedings including notice of charges, right to counsel, right of confrontation and cross-examination, and privilege against self-incrimination). See In re Winship, 397 U.S. 358, 368 (1970) (determining that the proof-beyond-reasonable-doubt standard applies to delinquency proceedings); Kent v. United States, 383 U.S. 541, 562 (1966) (holding that the adjudication "hearing must measure up to the essentials of due process and fair treatment"); Breed v. Jones, 421 U.S. 519, 531 (1975) (concluding that double jeopardy protection applies to delinquency proceedings).

However, the Supreme Court, in a plurality opinion, McKeiver v. Pennsylvania, held that a trial by jury was not constitutionally required for juvenile court adjudications. 403 U.S. 528, 545 (1971). In so concluding, the Court reasoned, "[T]he applicable due process standard in juvenile proceedings . . . is fundamental fairness." Id. at 543. The

-14-

Supreme Court determined that the requirements of notice, counsel, confrontation, cross-examination, and standard of proof naturally flow from the notion of fundamental fairness. Id.

In Burns, the Tennessee Supreme Court cited favorably the reasoning of McKeiver and concluded that article I, section 8 of the Tennessee Constitution does not provide a juvenile defendant with the right to a jury trial upon de novo appeal of a determination by the juvenile court to transfer jurisdiction to criminal court. 205 S.W.3d at 417. In so holding, the court reasoned that because juvenile court proceedings are not criminal prosecutions, juvenile defendants are not afforded the full "panoply of constitutional rights accorded to criminal defendants." Id. Furthermore, the court stressed,

> [T]he system for dealing with juvenile offenders as juveniles is separate and distinct from the criminal justice system. On those occasions when a juvenile is transferred to criminal court to be tried as an adult, he or she is afforded the full panoply of constitutional rights accorded to criminal defendants, including jury trials. [The d]efendant in this case is not, however, being tried as an adult. He is being tried within the context of a system that was designed to avoid much of the trauma and stigma of a criminal trial. . . . We agree with the United States Supreme Court that "one cannot say that in our legal system the jury is a necessary component of accurate factfinding." McKeiver, 403 U.S. at 543 (emphasis added). A jury's "necessity" is further attenuated in the context of juvenile delinquency proceedings, which are aimed not at punishing the youthful offender, but at rehabilitating him. We are also persuaded that the McKeiver decision is correct in its concern for the juvenile court's "ability to function in a unique manner" in the absence of a jury. Id. at 547. Finally, we agree with Justice Blackmun's observation that, "[i]f the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment will come one day, but for the moment we are disinclined to give impetus to it." Id. at 551.

Id.

At the outset, we note that the Defendant presents his argument on appeal in the context of his rights to a fair trial and a speedy trial, but he bases his argument, in large part, on the three-year delay between the commission of the offense, ultimately alleged to have occurred on or about March 25 through April 1, 2013, and the filing of the juvenile delinquency petition, October 28, 2016. In the trial court, the Defendant's motion to dismiss asserted violations of his constitutional "rights of due process, his right to a speedy trial, and right to a fair trial." In Tennessee, it is well-settled law that "delay between the

commission of an offense and the commencement of adversarial proceedings does not violate an accused's constitutional right to a speedy trial" but instead implicates a defendant's Fifth Amendment due process rights. State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996) (quoting State v. Dykes, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990) overruled on other grounds as stated in State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000)). Accordingly, we will address the Defendant's claim on both due process and speedy trial grounds. See, e.g., State v. Thomas Lee Carey, Jr., No. M2013-02483-CCA-R3-CD, 2015 WL 1119454, at *10 (Tenn. Crim. App. Mar. 10, 2015) (employing a similar procedure).

## A. *Due Process*

The Due Process Clause of the Fifth Amendment requires dismissal of an indictment "if it [was] shown at trial that the pre-indictment delay . . . caused substantial prejudice to the [Defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307, 325 (1971). In Tennessee,

> [b]efore an accused is entitled to relief based upon delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain a tactical advantage over or to harass the accused.

State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997) (quoting Gray, 917 S.W.2d at 671).

"'[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.'" State v. Carico, 968 S.W.2d 280, 285 n.5 (Tenn. 1998) (quoting Doggett v. United States, 505 U.S. 647, 656 (1992)). However, a due process violation, unlike a speedy trial violation, must demonstrate actual prejudice in relation to the due process claim. Utley, 956 S.W.2d at 495. "[P]otential forms of prejudice cannot be presumed and instead must be substantiated by the defendant." Id.

The applicable statute of limitations joins the right of due process in protecting the accused from excessive pre-accusatory delay. Id. at 493; State v. Carico, 968 S.W.2d 280, 285 n.3 (Tenn. 1998) ("[A] statute of limitations normally is the primary safeguard against infringement upon due process resulting from long delays."). The Legislature has specifically tied the initiation of proceedings for sexual offenses against children to the time that the victim reaches adulthood. For the offense of rape of a child in this case, which was committed after June 20, 2006, the Legislature extended the statute of limitations to no later than twenty-five years after the child turns eighteen. Tenn. Code Ann. § 40-2-101(h)(1), (2).

"It is the 'prosecution' which must be commenced within [the limitations period], not the finding of the indictment." Hickey v. State, 174 S.W. 269, 270 (Tenn. 1915). "So long as the prosecution begins within the prescribed limitations period, a subsequent indictment may issue despite any delay." State v. Lawson, 291 S.W.3d 864, 871 (Tenn. 2009). Tennessee Code Annotated section 40-2-104 "provides for the commencement of a prosecution by several methods, 'all deemed to provide the defendant with sufficient notice of the crime.'" State v. Ferrante, 269 S.W.3d 908, 914 (Tenn. 2008) (quoting State v. Tait, 114 S.W.3d 518, 522 (Tenn. 2003)). One such method included therein is "the issuing of a juvenile petition." Tenn. Code Ann § 40-2-104. We note that the prosecution for this offense was commenced within the applicable statutory period.

In Carico, the defendant was accused of various sexual offenses by a child victim who then recanted her testimony under the influence of her mother. 968 S.W.2d at 282-83, 285. When the victim renewed the allegations seven years later, the defendant asserted his due process rights would be violated by prosecution. Id. The Tennessee Supreme Court found that seven years was not "'profoundly excessive'" but "sufficient to require a careful review of the cause and results of the delay." Id. at 285 (quoting Gray, 917 S.W.2d at 673). The court determined that the defendant had shown no prejudice and that his due process rights were accordingly not violated. Id. In Gray, on the other hand, the initiation of proceedings for rape of a child after the lapse of forty-two years was found to violate the defendant's due process rights because the victim's memory had diminished, material witnesses were unavailable, and the victim could not specify the date of the incident. 917 S.W.2d at 673.

In this case, the length of the delay was approximately three and one-half years between the time of the offense and the filing of the delinquency petition. As in Carico, such a delay involving a child victim is not "'profoundly excessive'" but requires "careful review." 968 S.W.2d at 285 (quoting Gray, 917 S.W.2d at 673). The reason for the delay is not entirely clear. Investigator Stanfill's comments in the delinquency petition indicate that the State was aware of the allegations as early as July 2013. At trial, Investigator Stanfill explained that he was the second investigator to be assigned to the case and that the investigator who was initially assigned the case no longer worked for the Jackson Police Department. According to Investigator Stanfill, that investigator had failed to complete the investigation. We note that based upon the dates provided, Investigator Stanfill filed the delinquency petition against the Defendant just days after interviewing the victim and the victim's mother. It appears that the delay is in large part due to some level of incompetence or inaction of the initial investigator. Despite this, nothing in the record indicates that the State caused the delay in order to gain a tactical advantage over or to harass the Defendant.

Relative to prejudice, the Defendant claims that the delay prejudiced his case "because he possibly could have been adjudicated as a juvenile rather than as an adult since he was a juvenile when the allegations first arose in 2013" and that the memories of the witnesses were affected by the passage of time given that neither the victim nor the victim's mother "could recall specific time periods or a possible traumatic injury involving rectal bleeding." However, as noted above, the juvenile transfer decision was supported by reasonable grounds,[6] and the Defendant does not identify any witnesses he was unable to locate or explain how the faded memories actually prejudiced his defense; in fact, the faded memories actually inured to his benefit, and the jury was presented with evidence by the Defendant of the alibi, dismissal, and re-indictment process that took place here. Accordingly, assessing the factors outlined in Utley, the Defendant is not entitled to relief on Fifth Amendment due process grounds. See, e.g., Carey, 2015 WL 1119454, at *11 (reaching a similar conclusion).

## B. *Speedy Trial*

We turn next to the Defendant's claim that his right to a speedy trial was violated. Once criminal proceedings have been initiated, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. Tennessee also has a statutory right to a speedy trial. See Tenn. Code Ann. § 40-14-101.

The purpose of the right to a speedy trial is to protect defendants from "oppressive pre-trial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." Doggett, 505 U.S. at 654. In Barker, the United States Supreme Court laid out the four factors reviewing courts must balance when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) prejudice to the defendant. 407 U.S. at 530-32. The Tennessee Supreme Court implicitly adopted the Barker balancing test for our state's constitutional and statutory right to a speedy trial. State

---

[6] Also, we note that subsection (d) of the juvenile transfer statute provides that,

> If a person eighteen (18) years of age or older is to be charged with an offense that was alleged to have been committed prior to such person's eighteenth birthday, the petition shall be brought in the juvenile court that would have had jurisdiction at the time of the offense. The juvenile court shall either adjudicate the case under its continuing jurisdiction authority under § 37-1-102(b)(5)(B) and (C) or undertake transfer proceedings consistent with this section.

Tenn. Code Ann. § 37-1-134(d) (2016).

v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973). A delay approaching one year will trigger the speedy trial analysis, and the presumption that delay has prejudiced a defendant intensifies over time. Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494. However, courts take into account the complexity of the case in evaluating the reasonableness of the length of the delay. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996).

We must first address when the Defendant's speedy trial right attached. Under the federal constitution, the right to a speedy trial only applies to "criminal prosecutions." U.S. Const. amend. VI. Similarly, the Tennessee Constitution guarantees the right to a speedy trial in "all criminal prosecutions." Tenn. Const. art. I, § 9. The State argues that juvenile court proceedings are not criminal prosecutions, and the right to a speedy trial does not apply until a case is initiated in criminal court. The State cites to Burns, discussed in part above, wherein the Tennessee Supreme Court held that juvenile defendants are not entitled to a jury trial upon de novo appeal to the criminal court, and in so doing, stated that "juvenile proceedings are not 'criminal prosecutions.'" 205 S.W.3d at 418 (citing Childress v. State, 179 S.W. 643, 644 (Tenn. 1915) (recognizing that "proceedings before a juvenile court do not amount to a trial of the child for any criminal offense" and that "the proceedings in a juvenile court are entirely distinct from proceedings in the courts ordained to try persons for crime")); see also Breed, 421 U.S. at 535 (recognizing that juvenile transfer statutes represent an attempt to impart to the juvenile-court system the flexibility needed to deal with youthful offenders who cannot benefit from the specialized guidance and treatment contemplated by the system).

However, were we to accept the State's argument, we would place a juvenile defendant in an untenable position with regard to his or her right to a speedy trial. As noted above, Tennessee Code Annotated section 40-2-104, which discusses the commencement of a prosecution, includes "the issuing of a juvenile petition." Tenn. Code Ann. § 40-2-104. This language was inserted into the statute in 2007. Though this statute is presented in the context of the limitations period and providing notice to an accused, were we to find it inapplicable in the context of speedy trial rights for juveniles, the statute of limitations would be satisfied by the issuing of such a petition, but a juvenile defendant would not be able to assert his right to a speedy trial until the case was formally indicted after transfer to criminal court. Thus, once a case was transferred to criminal court, a juvenile defendant could be detained prior to any indictment and languish under the shroud of charges and the case could linger indefinitely before formal accusation.

Moreover, we note that the Burns case dealt with whether or not a juvenile defendant was entitled to a jury trial following the juvenile court's finding him delinquent of having committed an offense which would be a felony if committed by an adult, and by virtue, the autonomy and jurisdiction of the juvenile court system. Here, the right to a speedy trial is more akin to the requirements of notice, counsel, confrontation, cross-examination, and

-19-

standard of proof that naturally flow from the notion of fundamental fairness. See McKeiver, 403 U.S. at 543. We therefore conclude that the same constitutional speedy trial rights apply in both juvenile and adult proceedings. Accordingly, a juvenile defendant's right to a speedy trial attaches once the juvenile delinquency petition is issued.

In the present case, the delinquency petition was issued against the Defendant on October 28, 2016, and the petition indicates that the Defendant was already in the custody of the Madison County Jail at that time. On November 8, 2016, the State filed a motion to transfer the Defendant from the juvenile court to criminal court, and an order was entered to that effect on February 7, 2017. The Defendant was indicted for the first time on January 29, 2018; again on May 30, 2018; and finally on February 25, 2019.[7] His motion to dismiss was not filed until March 25, 2019; his trial was held less than two months later on May 14, 2019.

The time period following issuance of the delinquency petition and the Defendant's trial in criminal court was over two and one-half years, which is sufficient to trigger a speedy trial analysis. Applying the four-pronged balancing test of Barker, however, it is clear that Defendant has not been denied a speedy trial.

First, the delay was not inordinately long. Second, the reason for the delay was a legitimate one, and not a part of a plan by the State to prejudice the Defendant. The record reflects that the Defendant was indicted in a separate case on January 29, 2018, Case Number 18-87, and that the State proceeded with the prosecution of that case before turning to the instant case. According to the State, that case was tried on May 30, 2018, resulting in a guilty verdict for aggravated sexual assault, and the Defendant was sentenced for that conviction on June 25, 2018. See State v. Kelvin Dewayne Golden, No. W2018-01477-CCA-R3-CD, 2019 WL 3412527 (Tenn. Crim. App. July 29, 2019), perm. app. denied (Tenn. Oct. 14, 2019) (reflecting a conviction for aggravated sexual battery and a ten-year sentence). Third, the Defendant did not assert his right to a speedy trial until he filed his motion to dismiss on March 25, 2019.[8] Finally, as we have previously stated, we are not aware of any prejudice in fact resulting from the delay in the proceedings. Moreover, much of the Defendant's pretrial incarceration can also be attributed to the other case in which

---

[7] The State correctly notes that the speedy trial right "does not apply during time periods when charges have been dismissed." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997) (citing United States v. McDonald, 456 U.S. 1, 8 (1982)). However, because any periods of dismissal in this case would have been relatively brief, we decline the State's invitation to waive the Defendant's speedy trial issue because the record does not contain evidence of the length of the periods of dismissal.

[8] We find no basis in law to conclude that the Defendant asserted his right to a speedy trial by filing a notice of alibi.

he was found guilty. Therefore, we conclude that the Defendant was not denied his right to a speedy trial.

### III. *Sufficiency of the Evidence*

On appeal, the Defendant contends that the evidence was insufficient to sustain his conviction. Specifically, he notes that "neither [the victim] nor his mother could provide consistent testimony regarding the alleged offense date" and that "neither [the victim] nor his mother recalled an alleged disturbing injury that caused rectal bleeding even though they discussed it on multiple occasions with Investigator Stanfill." The State responds that the evidence is sufficient, citing that the credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's

favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of rape of a child. In order to sustain a conviction of rape of a child, the State was required to prove beyond a reasonable doubt that (1) the Defendant unlawfully sexually penetrated the victim, (2) who was less than thirteen years old, and that (3) the Defendant acted intentionally, knowingly, or recklessly. Tenn. Code Ann. § 39-13-522. Sexual penetration is defined, in relevant part, as "sexual intercourse, . . . fellatio, [or] anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the Defendant's conviction for rape of a child occurring "on or about March 25 through April 1, 2013," as charged in the indictment. According to the witnesses, the victim stayed with his grandmother in 2013 while his mother worked. Because the victim's mother sometimes worked late, the victim spent the night. The Defendant also occasionally spent the night at the victim's grandmother's house. According to the victim's mother, she took the eight-year-old victim over to his grandmother's house during spring break of that year because the victim was out of school, and the Defendant was present during that time. The victim testified that while "[he] was lying in his bed one night," the Defendant came into his room, immobilized him, pulled down his pants, and forced his "private part" into the victim's anus. The victim testified at trial that this incident took place "[m]aybe around April," as well as stating that it happened while he was out of school on spring break and that it was both hot and warm outside. Both the victim and his mother testified that they moved from Chapel Ridge later that summer and that the victim thereafter reported the abuse.

As with many sexual offenses, the instant indictment does not specify an exact date for the offense but alleged that the offense occurred "on or about March 25 through April 1, 2013." The indictment may allege that an offense occurred "on or about" a specific date. See, e.g., State v. Judge Reginald L. Edmonds, No. 02C01-9708-CC-00334, 1998 WL 527232, at *4 (Tenn. Crim. App. Aug. 25, 1998). "The rule is that the offense must be proved to have been committed prior to the finding of the indictment . . . and, except where a special date is essential or time is of the essence of the offense, the time of the commission of the offense averred in the indictment is not material and proof is not confined to the time charged." State v. West, 737 S.W.2d 790, 792 (Tenn. Crim. App. 1987). Indeed,

> [t]he time at which the offense was committed need not be stated in the
> indictment, but the offense may be alleged to have been committed on any

-22-

day before the finding thereof, or generally before the finding of the indictment, unless the time is a material ingredient in the offense.

Tenn. Code Ann. § 40-13-207; see also State v. Byrd, 820 S.W.2d 739, 740 (Tenn. 1991). Specifically, with regard to sexual offenses involving a minor, one Court of Appeals has explained,

> This great latitude given to the State has a rational basis when the victim is a young child. A young child may make no outcry for several months or even years. When outcry is finally made, the child often is unable to establish a specific date of the offense but must pinpoint the event by describing it in terms of significant holidays, a particular residence, or the circumstances of the offense itself.

Sledge v. State, 903 S.W.2d 105, 108 (Tex. App. 1995). Our review of the record indicates that the State presented sufficient proof that the offense occurred "on or about" the dates alleged in the indictment.

Moreover, the victim acknowledged at trial his prior inconsistent testimony regarding the timing of the offense, but he affirmed that he stayed at his grandmother's house over spring break and that the Defendant was present. The jury was presented with the evidence of the victim's and his mother's prior inconsistent statements regarding the date the offense occurred, as well as whether the victim suffered any injury. Nonetheless, they chose to find the Defendant guilty. The jury resolved any inconsistencies in favor of the State, as was its prerogative. See State v. Elkins, 102 S.W.3d, 582-83 (Tenn. 2003) (evidence was sufficient to support conviction for rape of child, despite fact that victim's testimony contained some inconsistencies); Byrge v. State, 575 S.W.2d 185, 191 (Tenn. 1992) ("The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact"). Accordingly, we conclude that the evidence is sufficient beyond a reasonable doubt to support Defendant's conviction for rape of a child.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-23-